IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| RICHARD GOMEZ, an individual, | ) | Case No. CV 03-421-S-MHW |
| | ) | |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM DECISION AND** |
| | ) | **ORDER** |
| | ) | |
| v. | ) | |
| | ) | |
| MASTEC NORTH AMERICA, INC., | ) | |
| a Florida corporation; RENEGADE OF | ) | |
| IDAHO, INC., a Florida corporation; | ) | |
| MASTEC SERVICES COMPANY, INC., | ) | |
| a Florida corporation, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Currently pending before the Court for its consideration are the following motions:

1) Defendants' motion for summary judgment (docket # 53), filed June 7, 2005; 2) Plaintiff's

motion for partial summary judgment (docket # 58), filed June 7, 2005; 3) Plaintiff's motion to

amend to include a claim for punitive damages (docket # 61), filed June 8, 2005; 4) Plaintiff's

motion to strike affidavit in support of Defendants' motion for summary judgment (docket # 70),

filed July 1, 2005; and 5)  Defendants' motion to stay further discovery (docket # 85), filed

August 31, 2005.  The Court, having reviewed all materials submitted and having heard oral

argument, issues its rulings as follows.

**Memorandum Decision and Order- Page 1**

# I.
## Background.

This case involves a series of convoluted commercial transactions and acquisitions between various corporations and a limited liability company that has now morphed into a dispute between a former member of the limited liability company and the other entities.  As is often the case,  there are allegations of self-dealing, bad faith and broken promises among the parties. The Court will first describe the various parties.  The Plaintiff in this case, Richard Gomez ("Gomez"), owned heavy drilling equipment and supervised crews that bored directional tunnels to lay underground cable.  In 1999, Mr. Gomez merged his business with Weda Financial Corporation, Inc., and formed a Idaho limited liability company called Intermountain Drilling Co., LLC ("Intermountain").  The principals of Weda Financial were Patrick Scheufler, a CPA, and Clay Teramo, a financial investor.   Gomez and Weda Financial each owned 50% of Intermountain.

The next party is the original Renegade of Idaho, Inc. ("Renegade I"), incorporated in Idaho and located in Burley, Idaho.  The owner of Renegade I was Dennis Dayley.  Renegade I was also involved in the tunnel boring industry.  Through an acquisition that will be described in more detail later, Renegade I eventually became a Florida corporation, while maintaining the same corporate name of Renegade of Idaho, Inc. ("Renegade II").

The next party is MasTec North America, Inc., and its subsidiary MasTec Services Company, Inc., both of which are Florida corporations (collectively "MasTec").  MasTec is a large corporation that provides telecommunications networks and other services, including the upgrading and new construction of overhead and underground telecommunication systems for its customers.

**Memorandum Decision and Order- Page 2**

The project that brought the parties together, at least as far as this lawsuit is concerned, was a construction project by Pathnet Corporation to provide a underground telecommunication line between El Paso, Texas to Albuquerque, New Mexico. Renegade I had a directional drilling contract with Pathnet, and Renegade sought Intermountain's services as a subcontractor on the project. On June 9, 2000, Intermountain entered into a subcontract agreement with Renegade I to provide directional drilling services for the Pathnet contract. (See Second Amended Complaint, docket # 36, at exhibit A.) Gomez executed the agreement as managing partner of Intermountain.

At about the same time in June, 2000, Dayley was in the process of entering into an agreement to sell Renegade I to MasTec. This was soon accomplished and Dayley went to work for MasTec as one of its division managers. Through a series of inter-corporate transactions, Renegade II was eventually formed as a wholly owned subsidiary of MasTec. While Dayley was in the process of negotiating the sale of his company to MasTec, Gomez and he discussed the possible sale of Intermountain to MasTec. Since he had just gone through the process, Dayley offered to serve as a facilitator in the sale of Intermountain to MasTec. Serious discussions started in August, 2000, and eventually all three members of Intermountain, Gomez, Termano and Scheufler, were involved in various aspects of how the sale would be structured. Discussions and due diligence inquiries between MasTec and Intermountain proceeded through the Fall of 2000.

Meanwhile, Gomez was on site at the Pathnet project running drilling crews. Tensions started to develop between Scheufler and Gomez. These apparently started when Scheufler stated that there could not be any more salary draws by Gomez from Intermountain because the

sale date with MasTec was soon approaching and the accounts could not be drawn down.  There

was also a question about corporate assets because some of the equipment involved in the sale to

MasTec belong to Intermountain and some of the equipment was still owned by Gomez.  Gomez

told the other two member of Intermountain that he was not going to sell his equipment to

MasTec and was out of the sale; in other words, when MasTec bought Intermountain they would

not be buying Gomez.  Mr. Teramo went to New Mexico to meet with Gomez.  He told Gomez

that the sale was very close and that Teramo had Scheufler under control and that they would all

make more money if they sold Intermountain as a whole rather than separately.  Gomez agreed

to go ahead with the deal, but apparently came up with his own plan on how he would make up

for the salary draws he was no longer getting from Intermountain.

　　　　According to Gomez, he decided to run one of the drills separately from Intermountain.

Gomez states that he ran this drill with his brother-in-law and some other workers, but not

employees of Intermountain. As far as this arrangement was concerned, Gomez did not view

himself as a subcontractor of Intermountain, but rather he was just doing things "within the LLC

separately from Clay (Teramo) and Patrick (Scheufler)."  Gomez Deposition, page 99, line 4-6.

Gomez states that he advised Teramo of his intentions to run his own drill but never notified

Scheufler.  Gomez also continued to supervise the Intermountain drilling equipment and

employees and would sends statements of the work that had been done to Scheufler, who in

turned billed Renegade II for the work.  When asked at his deposition if he told Renegade II and

MasTec of the new "landscape" or arrangement within Intermountain where he would be doing

drilling work on his own account and that Intermountain crews would be also doing drilling

work, Gomez responded that he never advised MasTec or Renegade II of this because "It wasn't

different.  It was still – it  was in the same company," and "there was nothing different.  It was

the same machines, the same crews, the same people."  Gomez deposition, page 98, line 15-22.

Gomez's "side business" of running his own drilling machine on the Pathnet project  generated

two invoices which were submitted in March of 2001 to Renegade II and MasTec for payment.

Gomez testified that he told a representative of MasTec that there would be some invoices

coming through that were not included in the sale of Intermountain to MasTec.

Invoice 1184a and 1184b have a date at the top of January 1, 2001, and represent work

Gomez purportedly did in December, 2000, on the Pathnet project for a total of $117,881, and

invoice 2998 represents work done in January and February, 2001, on the Pathnet project for a

total of $72,067.   Gomez testified that he made a conscious decision not to submit the two

invoices until after Intermountain was sold to MasTec.  Gomez testified:

> Q. As you sit here today, the best recollection that you have is that you would
> have not submitted it until after the transaction closed?
>
> A.  I'm not sure if it was after the transaction closed or after I signed the Agreement
> or – I don't think it was.  I believe I submitted them in March.
>
> Q.  March of 2001?
>
> A.  Yes.
>
> Q.  What were you concerned about, that this might somehow foul up the transaction
> if you submitted these invoices at the wrong time.
>
> A.  I didn't think it would foul it up.  I thought there would be too much accounting.
> They would have a problem of who does this check go to, who does this check
> go to.  So I'd let them do their invoicing and billings, and then I did mine after that.
> I was going to be there.  I knew I had plenty of time to collect mine.  They wanted
> theirs at the close when it was done.
>
> Q.  By "they" you mean Intermountain Drilling"
>
> A.  Yes, After I was trying to close the books out.

**Memorandum Decision and Order- Page 5**

Gomez deposition, page 131, lines 11-24.

If the story of the invoices does not in and of itself present a murky enough series of transactions, there were also things going on between the three members of Intermountain relating to their respective ownership interest preceding the sale to MasTec.  In an agreement dated January 16, 2001, Gomez agreed to sell all of his interest in Intermountain Drilling Co., LLC, to Weda Financial Corporation, Inc., for the sum of $130,000.  So at the time of the sale, Gomez was not even a member of the LLC, a fact apparently not disclosed to MasTec since Gomez represented in that purchase agreement that he was a member of the LLC and signed as a member.  Gomez down plays the sale of his interest in Intermountain prior to the sale to MasTec on the grounds that it was done for "tax reasons."

On January 31, 2001, Gomez, on behalf of Intermountain, signed a Subcontractor Release which stated that it had paid in full any amounts owing to any of the "Subcontractor's own subcontractors, employees, agents, suppliers and others that have performed any labor or supplied any materials or equipment in connection with the a Project... ."  (Exhibit A to affidavit of Bryan Westerman.)  Gomez testified that Intermountain was trying to close the books for the sale to MasTec and that Schefluer was trying to keep track of the work Intermountain was doing for Renegade II on the Pathnet project.   While Plaintiff alleged in his Second Amended Complaint that the sale took place on January 25, 2001, and attached an Asset Purchase Agreement as Exhibit D, this agreement was not signed by MasTec.  Several of the attachments were blank and it appears the parties were still working on the final accounting and balance sheets before executing the sales agreement.  Attached as Exhibit I to the affidavit of Eric Rossman in opposition to Defendants' motion for summary judgment is the final Asset Purchase

Agreement dated February 20, 2001, which was the closing date.  Exhibit 1.4(b) to the Asset

Purchase agreement sets forth the purchase price allocation:

| | |
|---|---|
| Lease Payoffs for Equipment: | $580,722.01 |
| Equipment (Acquired Assets): | $209,495.99 |
| Accounts Receivable Renegade: | $551,317.34 |
| Goodwill: | $475,000.00 |
| | $1,816,535.34 |

The sales agreement provided that  MasTec would pay Intermountain, as part of the sale, the

receivables still due to Intermountain for work it had done on the Pathnet project for Renegade

II, in the exact amount of  $551,317.34.  MasTec asserts that it was completely surprised when,

several weeks after the sale had closed,  Gomez submitted his own invoices for work done for

Renegade II in the amount of $189,948.00, which under the price allocation would now bump

the purchase price up to $2,006,483.34.

The Asset Purchase Agreement between Intermountain and MasTec had another

component that plays into the current dispute between Gomez and MasTec, which is Gomez's

breach of an employment contract claim.  As to this claim, Gomez alleges that, in consideration

for him entering into the non-compete clause included in the Asset Purchase Agreement,

MasTec, through Dennis Dayley, agreed to employ Gomez.  Pursuant to this "employment

agreement," Gomez alleges that he was to be employed for a term of five years as the head of

MasTec's boring division and he was to be paid an annual salary of $120,000 plus expenses.  In

addition, Gomez alleges that the employment agreement provided for an "earn out bonus" equal

to 7% of the boring division profits in excess of a 25% profit margin for the division.  Gomez

asserts that the employment agreement could only be terminated for good cause.  As a legal

defense, MasTec contends that there was no written employment agreement and any oral agreement would be barred by the statute of frauds.

Gomez did do work for MasTec in charge of the boring division for the years 2001 and 2002, during which time he received his salary.  He alleges that, in early 2003, Dayley gave him a financial statement that showed that the boring division had earned gross revenues in 2002 of $6.6 million with a 31% profit margin.  Gomez alleges that, based on these figures, he was entitled to receive an earn out bonus for 2002 of $426,975.

Gomez never received his bonus but instead, on March 26, 2003, he received a call from Ryan Phipps, MasTec's chief of operations, who notified Gomez that his employment was terminated and that he would not be given the bonus.

Gomez has alleged the following causes of action:  1) breach of the subcontract agreement with Renegade II and/or MasTec for failing to pay the invoices for work he did on his own account as a member of Intermountain;  2) breach of the employment contract by MasTec for failing to pay him five years' of salary plus the earn out bonuses; 3) breach of implied duty of good faith and fair dealing under the subcontract agreement; 4) breach of implied duty of good faith and fair dealing under the employment contract; and 5) breach of the Idaho Wage Clam Act, Idaho Code 45-601, *et seq.,* for failure to pay the wages due and owing within ten days of termination of employment.

## II.

### Standard of review.

Motions for summary judgment are governed by Fed. R. Civ. P. 56.  Rule 56, which provides in pertinent part, that judgment "shall be rendered forthwith if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[1]

The United States Supreme Court has made it clear that under Rule 56, summary judgment is required if the nonmoving party fails to make a showing sufficient to establish the existence of an element which is essential to his case and upon which he/she will bear the burden of proof at trial.[2]  If the nonmoving party fails to make such a showing on any essential element of his case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[3]

Under Rule 56 it is clear that an issue, in order to preclude entry of summary judgment, must be both "material" and "genuine."  An issue is "material" if it affects the outcome of the litigation.  An issue is "genuine" when there is "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth

---

[1]        Fed. R. Civ. P. 56(c).

[2]        *See Celotex Corp. v. Citrate*, 477 U.S. 317, 322 (1986).

[3]        *Id.* at 323. *See also* Rule 56(e).

**Memorandum Decision and Order- Page 9**

at trial,"[4] or when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."[5]   The Ninth Circuit cases are in accord.[6]

### III.
### COUNTS ONE AND THREE
### Defendants' Motion for Summary Judgment
### Plaintiff's Motion for Partial Summary Judgment

Both parties have moved for summary judgment on Counts One and Three, which relates to the invoices submitted by Gomez after the sale of Intermountain to MasTec.  MasTec asserts that counts One and Three should be dismissed on the ground that the work reflected in the invoice was not work performed by Intermountain pursuant to any contract with Renegade I or II.  The Court agrees.

Gomez, under his own name, submitted three invoices totaling $189,948 for drilling work done between December, 2000, and February, 2001, for the Pathnet project.  During this time, Intermountain had already decided to sell to MasTec and the three "members" of Intermountain, Gomez,  Teramo, and Scheufler, were not getting along.  Defendants assert that the work that Gomez billed for was not, by Gomez's own testimony, performed by Intermountain , but was actually performed by him personally with the assistance of non-Intermountain employees or Intermountain employees working off the clock.  (See Salmi affidavit, docket # 56, at exhibit A - Gomez deposition excerpt.)  Gomez testified that he ran his own drill and would "do bores separately" [from Intermountain ] on the Pathnet project with the help of his brother-in-law or

---

[4]    *Hahn v. Sargent*, 523 F.2d 461, 463 (1st Cir. 1975) (quoting *First Nat'l Bank v. Cities Serv. Co., Inc.,* 391 U.S. 253, 289 (1968)), *cert. denied,* 425 U.S. 904, 96 S. Ct. 1495, 47 L.Ed.2d 754 (1976).

[5]    *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986).

[6]    *See British Motor Car Distributors, Ltd. v. San Francisco Automotive Industries Welfare Fund*, 882 F.2d 371 (9th Cir. 1989).

**Memorandum Decision and Order- Page 10**

other friends.  (*Id.*)  He further testified that the invoices that he submitted to Renegade II and

MasTec after the sale were invoices that he "submitted by myself."  (*Id.*)  Based on this

testimony, MasTec  asserts that the Gomez invoices were not submitted for work performed

pursuant to the subcontract that was entered into between Intermountain and Renegade I, so

there can be no breach of contract.

        In addition,  Gomez executed a "Partial Subcontract Release" on January 31, 2001, in

which Intermountain released all claims for payment that existed against Idaho Renegade II in

exchange for consideration in the amount of $89,458.  (See Westerman affidavit, docket # 55, at

exhibit A - release.)  Based on this, MasTec argue that any claim for non-payment for work done

prior to January 31, 2001, was relinquished when the release was executed in exchange for

consideration. Gomez is asserting a claim here for work done in February of 2001.

        The release also bars any claim for payment by "any person or entity claiming through or

on behalf of the subcontractor."  Therefore, Defendants assert that even if Gomez had a separate

cause of action for work he alleges that he performed separately from Intermountain, this aspect

of the language of the release would bar it.  Accordingly, MasTec argues that Gomez cannot

recover any of the amounts he seeks under the invoices he submitted in March of 2001.

        These are persuasive arguments, but the ultimate bar to any claim by Gomez after he

participated in the sale of Intermountain to MasTec is found in the clear language of the Asset

Purchase Agreement.   Setting aside the fact that at least one member of the LLC had absolutely

no knowledge that Gomez was working his own drill and the other member was only generally

aware of it because Gomez says he told him, the three members of LLC would be walking away

from the sale with money in their pockets based in substantial part on what Renegade II owed

**Memorandum Decision and Order- Page 11**

Intermountain for work done on the Pathnet project.  Gomez's reason for not informing MasTec that he personally wanted another $189,948.00 from the sale rings hollow, that he did not want to "confuse" the sale by having too many checks written to different people at the time of closing.

As a signatory to the Asset Purchase Agreement, Gomez is bound by the terms of the agreement.  *See Tolley v. Thi Co.,* 140 Idaho 253, 260-61, 92 P.3d 503, 510-11 (2004) (signatory to an agreement is bound by its terms).  Paragraph 6.2 of the Asset Purchase Agreement provides that the member of Intermountain shall indemnify and hold MasTec harmless from "any claim, debt, obligation or liability of Seller that is not specifically assumed by the Buyer pursuant to this Agreement."  Gomez is pursuing a claim for payment as one of the members of the LLC (even while he professes to be doing work on his own account within the LLC).  However he can not assert a cause of action to collect on his claim because he is contractually obligated to collect to indemnify and hold MasTec harmless for this claim.

Also Gomez failed to disclose material facts to MasTec at the time of the sale which would have had a significant impact on the parties negotiations and the purchase price for Intermountain.  Gomez knew that Scheufler was provided daily input to MasTec on the amount of the boring to a date certain.  This was contrary to Gomez's hold practice of only billing once a month.  The purpose was to set a cut-off date so that MasTec and Intermountain would know exactly what amount would be paid to Intermountain for the "Renegade invoices" as of that date.  Work after that date would be billed for and paid separately.   But Gomez never told Scheufler or MasTec about the work on his own account, even for the substantial amount of work he did in December of 2000.  Of course if he had, then it would have gone into the Intermountain pie to be

divided among the members, whereas if he concealed it and provided no dailies, it might go into his own pocket somewhere down the road.

The Asset Purchase Agreement includes a warranty that no member has concealed any material facts relating to the transaction.   Paragraph 6.2 provides for indemnification for any "claims" made which are not disclosed in the agreement, which this certainly is one.  For these reasons Gomez is not entitled to summary judgment on Counts One and Three, and summary judgment will be entered in favor of MasTec.

## IV.
## COUNTS TWO, FOUR AND FIVE.
### Defendants' motion for summary judgment.

MasTec asserts that Gomez's claims that he is entitled to damages for the breach of his oral contract for employment for five years as set forth in Counts Two, Four, and Five are barred by the Idaho statute of frauds for failing to be in writing as a contract that could not be completed within one year, citing  Idaho Code 9-505(1).  *See Burton v. Atomic Workers Fed. Credit Union,* 119 Idaho 17, 20, 803 P.2d 518 (1990) (a contract of employment for a fixed term greater than one year is subject to the statute of frauds).  Under Idaho law, plaintiff bears the burden of proving the existence of a written agreement. *See Century 21 Quality Properties, Inc. v. Chandler,* 103 Idaho 193, 196, 646 P.2d 435 (Ct. App. 1982).  In this case, Gomez  has admitted in response to Defendants' requests for admission that no writing evidencing the employment/bonus agreement exists.  Normally, absent such an agreement, the statute of frauds bars the breach of contract claim.  *Id.* at 196.

However, there is an exception to the statute of frauds defense and that is if the defendant acknowledges the existence of an oral contract. *Treasure Valley Gastroenterology Specialists,*

*P.A. v. Woods,* 135 Idaho 485, 491, 20 P.3d 21 (Ct. App. 2001).  In order to circumvent the

writing requirement of the statute of frauds, however, the defendant would have to acknowledge

the "contract alleged," or acknowledge that the parties agreed to the contract terms alleged by

the plaintiff.  *Id.*  However, "Where the 'admission' consists of statements merely confirming . . .

that the defendant had agreed to certain terms different from those alleged by the plaintiff, it will

not operate to remove the alleged contract from the Statute... ."  *Id.* at 491-92.

Here, MasTec has acknowledged that it entered into an oral agreement with Gomez for

employment with its subsidiary Renegade II and that an aspect of the compensation was that

Gomez would be paid annual bonuses if certain conditions were met each year.  MasTec disputes

that it agreed to hire Gomez for a set term of five years or that he could only be terminated for

cause.  MasTec also dispute the manner in which the bonus was to be calculated.  MasTec argues

that this limited acknowledgment on their part does not preclude the applicability of the statute

of frauds and the requirement that the agreement be in writing.   Defendants assert that counts

Two, Four, and Five are barred and should be dismissed.

The Court agrees with MasTec that Gomez claim to a five year employment contract is

barred by the statute of frauds since it was not in writing and does not come within the one year

exception.  The Court also agrees with MasTec that bonus agreement was tied to the

employment contract and there would be no separate five year entitlement to a bonus absent

Gomez's continued employment and for the same reason, any such five year contract would be

subject to the statute of frauds.

However, the Court disagrees with MasTec that Gomez would not be entitled to a bonus

for the years that he did work for MasTec under the oral agreement for employment for the

reason that it would be possible for the conditions of the earn out bonus to be completed within one year, on a year-to-year basis, during Gomez's actual time of employment.  Under these circumstances, the bonus agreement would not be required to be in writing and the statute of frauds would not apply to the bonus during the actual years worked.  However, because there are disputed issues of material fact as to what exactly were the terms of the bonus agreement were and how it would be computed,  the Court is precluded from entering summary judgment on that aspect of Gomez's claim under count II of the complaint..

**V.**

**Plaintiff's motion to amend to add claim for punitive damages.**

Idaho Code 6-1604(1) provides the statutory standard for the recovery of punitive damages as follows:

> In any action seeking recovery of punitive damages, the claimant must prove, by clear and convincing evidence oppressive, fraudulent, wanton, malicious or outrageous conduct by the party against whom the claim for punitive damages is asserted.

Plaintiff's claim for punitive damages centers around the assertion that he was entitled to a bonus of the net profits earned between the 25% and 32% profit margins.  He asserts that, in March, 2003, when Dennis Dayley showed him the financial statement of earnings for 2002, it showed that the boring division did not make a profit which exceeded 25%.  In the course of discovery, however, Gomez received an additional financial statement which showed a profit when "subcontractor crews and intracompany crews were also included."  In addition, Gomez asserts that many expenses that were attributed to the boring division in 2002, such as the Risk Manager expense, were overstated or inflated, and were arbitrarily assigned to the boring division.

Gomez argues that he is entitled to amend his complaint to include a claim for punitive damages on the ground that the Defendants acted in "disregard of the likely consequences of his acts" and that it was "an extreme deviation from the reasonable standards of conduct."  Gomez further argues that the evidence of record shows a "reasonable likelihood" of being able to prove facts in support of his punitive damages claim at trial.

The parties clearly disagree as to what information should have been included in the 2002 financial statement and how the information could be interpreted, but this bit of "evidence" is insufficient to give rise to the Plaintiff's required showing that:  1) the Defendants' conduct constituted an extreme deviation from reasonable standards of conduct; and 2) that the Defendants acted with an extremely harmful state of mind.  *See General Auto Parts Co. v. Genuine Parts Co.,* 132 Idaho 849, 852-53, 979 P.2d 1208 (1999).  With these elements missing, an award of punitive damages is not warranted and Plaintiff's motion must be denied.

## VI.
### Plaintiff's motion to strike affidavit submitted in support of Defendants' motion for summary judgment.

Plaintiff moves to strike exhibit A, the release, to the Westerman affidavit (docket # 55) that the Defendants submitted in support of their summary judgment motion.  Gomez argues that the release was never disclosed by the Defendants during the discovery process even though the Plaintiff "specifically requested that Defendants identify any documents which would support their denial of Plaintiff's claims for the unpaid invoices."

Defendants respond by showing that the release was a document that was indeed supplied to Plaintiff, at Plaintiff's counsel's request, at the time Plaintiff's counsel identified it during an inspection of documents.  Apparently Plaintiff's counsel is in possession of nearly sixty (60)

boxes of documents involving the case, so it is understandable that he might overlook having one document in particular.

Nonetheless, Plaintiff's counsel is not prepared to leave the argument there. Plaintiff further asserts that the release should be stricken anyhow because it was never specifically provided by the Defendants in response to Plaintiff's discovery requests, but only upon inspection. Defendants assert that the documents provided as a result of Plaintiff's inspection were identified as being responsive to Plaintiff's discovery requests.

At any rate, there is no dispute that Plaintiff did have a copy of the release in his possession before the motion was filed , so he cannot legitimately claim surprise or prejudice. The motion to strike will be denied.

## VII.
### Defendants' motion to stay further discovery.

Defendants seek a stay on all further discovery, including expert discovery, until such time as the Court has ruled on the pending summary judgment motions.

The parties shall have thirty (30) days from the date of this Order to complete any discovery necessary with regard to the earn out bonus compensation aspect of Gomez's former employment.

## ORDER

Based on the foregoing, the Court being otherwise fully advised in the premises, **IT IS HEREBY ORDERED that:**

1)      Defendants' motion for summary judgment (docket # 53), filed June 7, 2005, is GRANTED IN PART and DENIED IN PART as follows:

A)      The motion is GRANTED as to Counts One, Three, Four, and Five.

**Memorandum Decision and Order- Page 17**

B)    The motion is PARTIALLY GRANTED as to Count Two insofar as it relates to Plaintiff's claim relative to there having been a five-year employment contract.

C)    The motion is PARTIALLY DENIED as to Count Two insofar as it relates to Plaintiff's claim for an earn out bonus during the time he was employed.

2)    Plaintiff's motion for partial summary judgment (docket # 58), filed June 7, 2005, is DENIED.

3)    Plaintiff's motion to amend to include a claim for punitive damages (docket # 61), filed June 8, 2005, is DENIED.

4)    Plaintiff's motion to strike affidavit in support of Defendants' motion for summary judgment (docket # 70), filed July 1, 2005, is DENIED.

5)    Defendants' motion to stay further discovery (docket # 85), filed August 31, 2005. is GRANTED.

DATED:

Honorable Mikel H. Williams
United States Magistrate Judge

**Memorandum Decision and Order- Page 18**